*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

<u>**ENTRY ORDER**</u>

SUPREME COURT DOCKET NO. 2014-294

JULY TERM, 2015

In re J.P.                                     }       APPEALED FROM:
                                               }
                                               }       Superior Court, Lamoille Unit,
                                               }       Family Division
                                               }
                                               }       DOCKET NO. 10/12-6-14 Lemh

                                                       Trial Judge: Timothy B. Tomasi

In the above-entitled cause, the Clerk will enter:

J.P. appeals from a superior court decision that he is a "patient in need of further treatment," thus maintaining his hospitalization for one year, pursuant to 18 V.S.A. § 7621(b). J.P. contends the evidence was insufficient to support the court's finding that he poses a danger of harm to others. We affirm.

The facts may be summarized as follows. J.P. was initially committed to the custody of the Vermont Department of Health based on a finding by the criminal division that he was a "person in need of treatment."[1] With the consent of the parties, the trial court in this matter took judicial notice of the initial order of hospitalization, issued in March 2014, which provides the factual background. In brief, J.P. was charged with the kidnapping and murder of Kathleen Smith in October 2010 in the City of Burlington. Smith worked at the Howard Center in Burlington, and was a friend of Sharon Fialco, the mother of J.P.'s youngest child. The police investigation led to J.P., who was found hiding in a barn not far from Smith's abandoned vehicle, in possession of a knife, which later forensic testing revealed had Smith's blood under the handle, a piece of rope that matched the type used to bind Smith's hands, and a Howard Center first-aid kit.

A psychiatrist, Dr. John Molloy, who evaluated J.P. before trial, concluded that he suffers from a major mental illness, "delusional disorder-persecutory type," which results in false and delusional beliefs that others are conspiring against him. These thoughts focused at times on Ms. Fialco and included the belief that Ms. Fialco's relatives and friends were attempting to deprive him of contact with his daughter. Based on over thirty hours of interviews with J.P. over a two-year period, Dr. Molloy found that J.P.'s conspiratorial delusions extended to the court system and its participants, and this resulted in a finding by the court in January 2014 that J.P. was not competent to stand trial.

---

[1] "A person in need of treatment" is defined, in part, as "a person who has as mental illness and, as a result of that mental illness, his or her capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations is so lessened that he or she poses a danger of harm to himself, to herself, or to others." 18 V.S.A. § 7101(17).

The finding of incompetency led to a hospitalization hearing in February 2014. See 13 V.S.A. §§ 4820(2), (4) (upon finding of incompetence to stand trial under 13 V.S.A. § 4817, the court "shall hold a hearing to determine whether such person should be committed to the custody of the Commissioner of Mental Health"). Dr. Molloy testified that J.P.'s mental illness resulted in paranoia and perceived conspiracies against him by his family and acquaintances, the prosecutor, and the police, had a significant impact on his ability to interact safely with others, and increased his risk of violence. For example, J.P. recounted to Dr. Malloy an incident when, in 2009 or 2010, he attempted to restrain a woman with handcuffs and a taser device because he believed she was conspiring against him. The court also considered the circumstances of Kathleen Smith's murder—she sustained grievous knife wounds to her neck and blunt injuries to her face—and found a direct causal connection between J.P.'s illness and the fatal assault against Smith, who was among the circle of friends of Ms. Fialco whom J.P. perceived were conspiring against him.

Accordingly, the trial court concluded that J.P. suffered from a mental illness which substantially impacted his life and thinking, and that as a result he posed a danger to others. See 18 V.S.A. § 7101(17) (defining "person in need of treatment" as "a person who is suffering from mental illness and, as a result . . . poses a danger of harm to himself . . . or to others"). The court committed J.P. to the custody of the Commissioner of Mental Health for ninety days, and he was ultimately placed in the Vermont Psychiatric Care Hospital.

In June 2014, the State filed an application for continued treatment, asserting that J.P. remained a "patient in need of further treatment" under 18 V.S.A. § 7107(16) (defining "patient in need of further treatment" as either "a person in need of treatment" or "a patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his or her condition will deteriorate and he or she will become a person in need of treatment").[2] The court held an evidentiary hearing on June 19, 2014, and issued a written decision one week later. Dr. Novas-Schmidt, J.P.'s treating psychiatrist at the Vermont Psychiatric Care Hospital, testified for the State. In addition, as noted, the court took judicial notice of the initial hospitalization order.

Dr. Novas-Schmidt testified, and the court found, that J.P. continues to suffer from the same mental illness of "delusional disorder—persecutory type" that resulted in the initial hospitalization and that this illness results in a delusional belief that others, including Dr. Novas-Schmidt, are conspiring against him. Dr. Novas-Schmidt noted that, while incarcerated, J.P. was the subject of several incident reports involving possession of weapons—a four-foot wire and modified nail clipper. She also testified that, although he had not physically assaulted any other patients or staff while hospitalized, J.P. had exhibited highly impulsive, reactive, and angry behavior by screaming and punching walls and windows, and had directed that anger on at least occasion against Dr. Novas-Schmidt. Dr. Novas-Schmidt was firmly of the view that J.P.'s continued hospitalization—where he was under close supervision and oversight by trained staff—was necessary to treat J.P.'s illness and keep himself and others safe, although she believed that medication in addition to psychotherapy was necessary for him to make progress. She was of the opinion that, if released from hospital to corrections, J.P. would present a danger to others.

---

[2] The State simultaneously filed an application for involuntary medication. As noted, infra, n.3, the court denied this request, and the State has not appealed from this ruling.

2

The trial court found "persuasive" Dr. Novas-Schmidt's testimony that interacting with "persons other than staff trained to deal with his outbursts and mental condition" could provoke more assaultive behavior; that if released and confronted with persons he believed were conspiring against him there was "a likelihood that he would react violently towards those persons"; that the Vermont Psychiatric Care Hospital was providing necessary and appropriate treatment; and that, if released, J.P.'s "condition would likely deteriorate, and he would likely become even more dangerous." Accordingly, the court concluded that J.P. was a patient in need of further treatment, and issued an order of hospitalization for one year. This appeal followed.[3]

Our review is deferential. "This Court reviews a trial court's findings of fact in the light most favorable to the prevailing party, disregarding the effect of modifying evidence, and we will not set them aside unless they are clearly erroneous." In re T.C., 2007 VT 115, ¶ 12, 182 Vt. 467 (quotation omitted). We will uphold the court's conclusions if "consistent with the controlling law and . . . supported by the findings." Id. (quotation omitted).

J.P. contends that that the evidence failed to support the trial court's finding that he was a "patient in need of further treatment." He claims, more specifically, that the evidence did not support the findings that he was in need of treatment, or that he was receiving adequate treatment in hospital and that if his treatment were discontinued he would present "a substantial probability that in the near future his . . . condition will deteriorate" and result in his becoming "a person in need of treatment" by presenting a danger of harm to others. See 18 V.S.A. §§ 7101(16), (17).

J.P. relies in this regard on Dr. Novas-Schmidt's testimony that he had not physically assaulted, threatened, or placed anyone in fear of physical harm during his three months in the hospital. He essentially claims that the trial court relied solely on his past violent behavior without properly considering current circumstances. He cites as controlling our decision in In re T.C., where we explained: "The purpose of an application for continued treatment is to examine whether the State can meet its burden of proving by clear and convincing evidence that a patient who is involuntarily hospitalized continues to require treatment." 2007 VT 115, ¶ 19. As we observed, in matters involving a patient's mental-health status, "few things are static," and therefore the court must consider "current evidence of the patient's mental health" in determining whether he or she is in need of further treatment. Id.; see also In re T.S.S., 2015 VT 55, ¶ 16, ___ Vt. ___ (construing "patient in need of further treatment" to require evidence not only that the person's condition will deteriorate in the near future, but also that there is a substantial probability the person will become a person in need of treatment in the near future, i.e., will present a danger to himself or others). "The fact that a person posed a threat of harm to himself or others at the time of an original commitment hearing does not mean he continues to pose the same three months or years later." In re T.C., 2007 VT 115, ¶ 23.

We have also recognized, however, that "the focus of a hearing to extend involuntary treatment is on whether the patient presents a risk of future harm if treatment is discontinued, not whether the patient poses a present danger." In re E.T., 2008 VT 48, ¶ 5, 184 Vt. 273. The

___

[3] The trial court denied the State's corollary application for involuntary medication. Applying the factors set forth in 18 V.S.A. § 7627(c), the court found that, although J.P. did not have the competence to make a medication decision, and that the potential benefits outweighed the likely risks, it was not persuaded that, after only three months of trial, in-patient psychotherapy did not represent an adequate alternative treatment. The State has not appealed from this portion of the judgment.

statutory scheme recognizes that with effective treatment a patient may not be currently dangerous, and thus focuses on "predictions about the effect of discontinuing treatment, rather than dangerousness. In re P.S., 167 Vt. 63, 71 (1997).

Viewed in light of the record evidence as a whole, J.P.'s claims lack merit. His treating psychiatrist testified that J.P.'s mental illness and resulting delusions and paranoia remained unchanged, and that the resulting frustration and anger which had manifested themselves in violence before remained in check principally because he was under close supervision by trained hospital staff. She also testified that, if J.P. were released to a correctional setting, there was a strong likelihood that these tensions would result in violence against others. Although she did not identify a specific timeframe, Dr. Novas-Schmidt made it clear that she was concerned about violent behavior as soon as J.P. was removed from the highly controlled hospital setting to a correctional facility. Cf. In re T.S.S., 2015 VT 55, ¶¶ 29, 30 (holding that evidence was insufficient where it merely suggested that patient would "eventually" become a person in need of treatment but it was "unknown" when this would occur). The evidence thus supported the court's findings, which were sufficient to show that J.P. remained in need of treatment, and that if released from hospital his condition would deteriorate and he would likely pose a threat of harm to others. Accordingly, we find no basis to disturb the judgment.

Affirmed.

BY THE COURT:

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

4